UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BONNIE R. KIRK,

               Plaintiff,

v.                                                Case No.  5:05-cv-399-Oc-10GRJ

JO ANNE B. BARNHART, Commissioner
of Social Security,

               Defendant.

_____

## REPORT AND RECOMMENDATION[1]

    Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security ("Commissioner") denying her application for disability insurance benefits

("DIB") and supplemental security income payments ("SSI"). (Doc. 1.) The

Commissioner answered (Doc. 4), and both parties have filed briefs outlining their

respective positions. (Docs. 9 & 10.) For the reasons discussed below the

Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

    Plaintiff filed an application for DIB and SSI on July 23, 2002, alleging a disability

onset date of December 31, 1998. (R. 58-60, 213-15.)  Plaintiff's application was denied

initially (R. 44-46, 218-219) and upon reconsideration (R. 40-41, 223-225). Plaintiff

requested a hearing before an Administrative Law Judge, which was held on June 21,

2004. (R. 275-289.) On October 15, 2004, following the hearing, Administrative Law

---

[1]Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local
Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely
objections shall bar the party from a *de novo* determination by a district judge and from attacking factual
findings on appeal.

Judge John D. Henson (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 16-25.) Plaintiff's request for review of that decision was denied by the Appeals Council on July 15, 2005, rendering the ALJ's decision the final decision of the Commissioner. (R. 6-8.)

## II.  ISSUES PRESENTED

Plaintiff raises two issues on appeal. First, she argues that the ALJ erred by not finding Plaintiff's pain/fibromylgia severe at step two of his sequential evaluation. Second, she argues that the ALJ failed to give appropriate weight to the opinion of Plaintiff's treating physicians, Dr. Michael P. Wiggins and Dr. Timothy D. Peterson.

In response to the first argument, the Commissioner maintains that the ALJ did find in Plaintiff's favor that Plaintiff had an impairment or combination of impairments considered severe. Furthermore, in the ALJ's Residual Functional Capacity ("RFC") analysis, the Commissioner submits that it was Plaintiff who failed to illustrate that the pain/fibromyalgia caused severe functional limitations on her ability to work.

As to the second argument, the Commissioner contends that the ALJ properly considered the opinions of Plaintiff's treating physicians, who only summarily concluded that Plaintiff was disabled and did not opine that Plaintiff's myofascial pain or fibromyalgia caused any specific functional limitations.

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such

---

[2] See 42 U.S.C. § 405(g).

relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff

---

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to

_____

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such

---

[16] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows: In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker, 826 F.2d at 1003.

[20] Wolfe, 86 F.3d at 1077-78.

evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV.  SUMMARY OF THE RECORD EVIDENCE

Plaintiff, born on September 30, 1959, was forty-four at the time of hearing. (R. 270.) She completed the tenth grade, obtained her GED and currently holds a valid cosmetology license. Id. Plaintiff last worked for her mother in 1998 as home health care aide taking care of her brother following his brain surgery. (R. 280.) Her duties included cleaning his trachea, maintaining his trachea and feeding tube, ordering supplies, helping him in and out of a chair, bathing him and giving him respiratory treatments. Id. Plaintiff performed this job for roughly seventeen years, off and on. (R. 280-81.)

Plaintiff claims that she became unable to work on December 31, 1998, due to chronic obstructive pulmonary disease (COPD)[22] and asthma[23]. (R. 20.) Specifically, at times she has shortness of breath and pain in her ribs and back. Plaintiff alleges that exertion worsens the pain and that heat and humidity worsens her breathing problems. (R. 21.)  Moreover, Plaintiff uses an inhaler and avoids odors and fumes. Id.

---

[21] See id.

[22] Chronic obstructive pulmonary disease is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

[23] Asthma is defined as an inflammatory disease of the lungs characterized by airway obstruction. Stedman's.

This appeal concerns Plaintiff's alleged severe pain and its effects on her ability to work, and the medical records from Dr. Timothy N. Peterson and Dr. Michael P. Wiggins. Thus, the Court will focus on those portions of the medical record relevant to Plaintiff's pain and Plaintiff's treating physicians.

In mid-1998, Plaintiff underwent several consultations at the PulMed H&P group at the Mayo Clinic in Jacksonville. (R. 243-62.) A final report from the Rheumatology Consult dated August 11, 1998 states that Dr. William W. Ginsburg, M.D., believed Plaintiff's pain to be myofascial[24] in origin. (R. 252-53.) Dr. Ginsburg agreed with a Dr. Ketki Modi, M.D. in Physical Medicine & Rehabilitation, who entertained the possibility of fibromyalgia[25] and affirmatively diagnosed Plaintiff with a myofascial component. (R. 250-51, 252.) Dr. Modi prescribed Elavil to help Plaintiff sleep and to improve her fatigue.  (R. 252.)

Plaintiff's summary evaluation from her PulMed H&P consultations, dated August 11, 1998, concluded that the medication Flovent showed significant improvement in Plaintiff's heaviness of the chest. (R. 254.) Dr. David A. Zisman, the authoring physician, stated that there was no evidence of asthma but that Plaintiff may have airway reactivity from emanation of formaldehyde in her mobile home. (R. 255.) Additionally, Dr. Zisman stated that Plaintiff had only two trigger points in her shoulder

---

[24] Myofascial is defined as of or relating to the fascia surrounding and separating muscle tissue. Stedman's.

[25] Fibromyalgia is defined as a syndrom of chronic pain of musculoskeletal origin by uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in axial distribution - cervical, thoracic, lumbar spine or anterior chest. Additionally, there must be point tenderness in at least 11 of the 18 specified sites. Stedman's.

to suggest fibromyalgia syndrome. Id. However, Dr. Zisman reported that Dr. Modi diagnosed her with a myofascial component and that Dr. Modi suggested that she be evaluated by a pain clinic for any injections or for diagnostic purposes for brief pain on her left side. Id.

On January 8, 1999, Plaintiff saw Dr. Michael P. Wiggins, M.D. at Citrus Primary Care, who found Plaintiff's pulmonary functions normal and he noted that he could not ascertain the cause of the patient's dyspnea[26]. (R. 122.) As for Plaintiff's chronic pain in her lower rib and thoracic spine, Dr. Wiggins noted the earlier diagnosis of myofascial componenet by Dr. Modi. Id. However, Dr. Wiggins stressed the need for Plaintiff to alter her habit of taking Ibuprofen 800 every day even though Plaintiff complained of significant problems if she missed even one dose. Id.

Dr. Wiggins' notes from March 16, 1999, state that Plaintiff had yet to follow through with the physical therapy conditional and pain clinic evaluation suggested by the PulMed H&P group at the Mayo Clinic. (R. 120.) Dr. Wiggins stated that Plaintiff continued to complain of back pain and rarely took her Darvocet. Id. Dr. Wiggins stressed that Plaintiff should continue with the back exercises that Plaintiff was recommended to perform and it was fine if the Plaintiff used a chiropractor. Id.

The notes from Plaintiff's November 18, 1999 visit with Dr. Wiggins disclose that Plaintiff was doing well with the occasional episode of myofascial pain. (R. 118.) Dr. Wiggins discussed with Plaintiff the need to increase her use of Darvocet for the pain. Id. On February 8, 2000, Dr. Wiggins noted Plaintiff's persistent pain in the neck and

[26] Dyspnea is defined as shortness of breath, a subjective difficulty or distress in breathing. Stedman's.

8

around the rib, as well as spasms. (R. 117.) Additionally, Dr. Wiggins noted the need to refer Plaintiff for further evaluation if a significant improvement was not made. Id. Upon referral, Plaintiff saw Dr. Timothy D. Peterson, M.D., on May 1, 2001. (R. 115.) Dr. Peterson noted that Plaintiff was concerned about the mass and swelling on her neck but did not find it painful. Id. Dr. Peterson prescribed an Ultrasound X-ray and a follow-up consultation after results were obtained. Id. The Court is unable to find the follow-up notes.

On July 18, 2001, Plaintiff saw Dr. Herbert I. Cohen, M.D., M.P.H., whose diagnostic impressions included possible radicuolpathic chest and shoulder pains, polyneuropathy[27] etiology and myalgia. (R. 156.) Following pulmonary tests and x-rays, Dr. Cohen diagnosed Plaintiff with a history of asthma, a history of hemoptysis, dyspnea undetermined etiology, no COPD, and chest pains which appear to be neuropathic. (R. 153.) Dr. Cohen prescribed Neurontin. Id. Plaintiff returned to Dr. Cohen on September 5, 2001, who noted that Plaintiff seemed to be tolerating the Neurontin. (R. 151.) Plaintiff showed Dr. Cohen her areas of pain, including lung, shoulder, neck and lower chest pain. (R. 152.) Additionally, Dr. Cohen referred Plaintiff to Dr. Murali Angirekula for pain management. Id. The record does not reveal notes from Dr. Murali.

On her September 26, 2001 visit, Dr. Cohen acknowledged that Plaintiff was improving and the pain had become bearable. (R. 149.) Dr. Cohen diagnosed Plaintiff

---

[27] Polyneuropathy is defined as a nontraumatic generalized disorder of peripheral nerves, affecting the distal fibers most severely and can affect motor and sensory fibers. Stedman's.

with myofascial pain syndrome, neuralgia[28], degenerative disc disease, a history of asthma and a history of hemoptysis. (R. 150.) Dr. Cohen continued to prescribe Plaintiff Darvocet and Neurontin for the pain. Id. On December 10, 2001, Plaintiff reported to Dr. Cohen that the Neurontin helped with the pain but that it made her mentally tired and sluggish. (R. 148.) Dr. Cohen continued recommending the same prescriptions for her pain Id. During the last documented visit with Dr. Cohen, Plaintiff reported that the Neurontin was doing a really good job of controlling the pain but caused her headaches. (R. 146.) Dr. Cohen referred her to a neurologist, Dr. Saleh for a consultation regarding her pain, which is not documented in the record. Id. Furthermore, Dr. Cohen noted that Plaintiff would need to come in for a follow-up in a month unless she was feeling better. Id.

In May 24, 2002, Dr. Peterson found Plaintiff's chest pain alleviated after being taken off of Prednisone. (R. 113.) Dr. Peterson also noted that Plaintiff's chronic obstructive pulmonary disease (COPD) was doing well. During a follow-up visit, Dr. Peterson noted that Plaintiff complained generally of fatigue and made no other complaints. (R. 110.) Dr. Peterson's Patient Data Summary Sheet, dated December 3, 2002, noted the following under a "Problem List": 1) reactive airway disease/asthma, 2) fibromyalgia, 3) chronic neck and back pain and 4) history of exposure to TB. During Plaintiff's December 3, 2002 visit, Dr. Peterson observed that Plaintiff's records revealed a history of fibromyalgia but that Plaintiff seemed to be doing well on Darvocet.

---

[28] Neuralgia is defined as a pain of a severe, throbbing ord stabbing character in the course of distribution of a nerve. Stedman's.

(R. 108.) Otherwise, Dr. Peterson stated that Plaintiff had periodic muscle aches relating to the fibromyalgia.

On February 21, 2003, Plaintiff complained of neck pain, numbness in her arms and increasing weakness. (R. 272.) Dr. Peterson prescribed an MRI of her neck. Id. The medical records illustrate that Plaintiff visited Dr. Peterson following the MRI but there is no discussion of its results in the record. (R. 271.) The following year, Plaintiff saw Dr. Peterson for a general follow-up on February 25, 2004. (R. 265.) In this most recent medical record, Dr. Peterson noted that Plaintiff was not experiencing pain but Plaintiff requested more Darvocet since she found it helpful. Id.

After reviewing the evidence, including Plaintiff's testimony and portions of the medical records, the ALJ found that Plaintiff had chronic obstructive pulmonary disease and concluded that this impairment was "severe" within the meaning of the regulations but not "severe" enough to meet or medically equal those listed in Appendix 1, Subpart P of Social Security Regulation Number 4. (R. 21.) Then considering Plaintiff's symptoms, pain and objective medical evidence, the ALJ determined that Plaintiff was not functionally limited by a severe respiratory impairment nor severe pain. (R. 21-22.)

The ALJ did acknowledge myofascial pain and fibromyalgia as possible sources of the pain, but found no evidence that it was a severe or persistent problem. (R. 22-23.) At most, the ALJ noted that the Plaintiff only occasionally complained of joint pain and intermittent neck pain. (R. 23.) Significantly, the ALJ pointed to Plaintiff's most recent medical reports stating that Plaintiff no longer had pain. Id. Moreover, the ALJ found Plaintiff's testimony regarding her subjective allegations of pain to be less than fully credible because it was not supported by the medical records. (R. 22.)

11

The ALJ next found that Plaintiff could not perform her past relevant work. (R. 23.) According to Plaintiff's Residual Functional Capacity assessment, the State Agency determined that Plaintiff had the RFC for light work with respiratory limitations. Id. Specifically, Plaintiff's past job as a home health care aid entailed lifting and carrying 50 to 100 pounds, which Plaintiff no longer could perform. Id.

Finally, the ALJ found that Plaintiff met the criteria of the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations directing a conclusion of "not disabled". Id. In finding so, the ALJ analyzed Plaintiff's RFC and vocational profile. Id. The ALJ stated that Plaintiff was able to perform all of the requirments of "light work", involving, lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds, walking and standing, some pushing and pulling of arms or legs, and was capable of performing a wide range of light work. (R. 24.) Furthermore, the ALJ stated that Plaintiff was defined as a younger individual with a high school equivalent education and had no transferable skills from any past relevant work. (R. 23.) Additionally, the ALJ found that Plaintiff did not have any nonexertional limitations.[29]  Thus, the ALJ concluded that Plaintiff was not disabled. (R. 25.)

## V.  DISCUSSION

Plaintiff contends that the ALJ erred by failing to find Plaintiff's myofascial pain/fibromyalgia severe at step two. Plaintiff also maintains that the ALJ violated the treating physician rule in rejecting the opinions of Plaintiff's treating physicians. For the

---

[29] The ALJ stated that according to Social Security Ruling 83-11, absent nonexertional limitations, the ALJ may use the Medical-Vocational Guidelines to decide whether or not a claimant is disabled solely according to the claimant's RFC. R. 23.

reasons discussed below, the Court concludes that the ALJ properly determined that Plaintiff's myofacial pain/fibromyalgia were not server impairments and that the ALJ properly considered the medical records of Plaintiff's treating physicians.

**A.     The ALJ Did Not Err In Finding that Plaintiff's Myofascial Pain/Fibromyalgia Were Not Severe**

The ALJ found at step two that Plaintiff's chronic obstructive pulmonary diseases were "severe" but not "severe" enough to meet or medically equal one of the impairments listed in the Social Security Regulations. At that juncture, the ALJ did not address Plaintiff's myofacial pain/fibromyalgia.

A severe impairment is an impairment which significantly limits a claimant's physical or mental abilities to do basic work activities.[30] The burden is upon Plaintiff at step two of the sequential analysis to establish that she has a severe impairment, although generally the threshold is minimal and easily met.[31]

Plaintiff avers that "common sense shows on the face of this record that Plaintiff's "myofacial [sic] pain/fybromyalgia is severe and needed to have been considered by the ALJ." Specifically, Plaintiff argues that Plaintiff's treating physicians consistently diagnosed Plaintiff with myofascial pain/fibromyalgia and, thus, it was legal error for the ALJ not to find such an impairment "severe." The Court disagrees for two reasons.

First, the ALJ found that Plaintiff had an impairment or combination of impairments considered severe. This finding was sufficient to satisfy step two of the

---

[30] 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a); Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987).

[31] McDaniel v. Bowen, 800 F.2d 1026, 1031 (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)).

sequential analysis because the finding of any severe impairment - even one impairment - is enough to satisfy the requirement of step two.[32] Here, the ALJ stated that the medical evidence disclosed that the Plaintiff suffered from chronic obstructive pulmonary disease, which the ALJ labeled as "severe". (R. 21.) Therefore, at that point the ALJ found that Plaintiff had satisfied step two and thus the ALJ proceeded to consider Plaintiff's myofacial pain and fibromyalgia as part of the determination of Plaintiff's RFC at step four of the sequential analysis.

Secondly, the ALJ did not err at step four by concluding that Plaintiff's myofacial pain and fibromyalgia did not cause additional limitations on Plaintiff's ability to work. Specifically, the ALJ considered and analyzed Plaintiff's back pain, chest pain, neck pain, diffuse musculoskeletal pain and myosfascial pain in his RFC analysis. (R. 21-23.) The ALJ made this finding based upon substantial evidence in the record that demonstrated that Plaintiff's pain was relieved by pain medication and began to dissipate. (R. 22.) In concluding that Plaintiff's pain had subsided, the ALJ pointed to recent medical reports from her treating physician, Dr. Peterson, from February and March of 2004. (R. 22.)

Although the record reflects that Plaintiff's doctors treated her for myofascial pain and fibromyalgia as early as 1998 the medical records do not contain any findings by the doctors that those impairments caused Plaintiff any severe functional limitations. Notably, none of Plaintiff's treating physicians, who documented Plaintiff's complaints of

---

[32] Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987)( "[w]hether or not it [the impairment] qualifies as a disability and whether or not it results from a single severe impairment ... is enough to satisfy the requirement of step two."); Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987).

shoulder, chest or back pain, observed any limitations upon Plaintiff's daily functioning as a result of her impairments nor did any of Plaintiff's doctors restrict her functional activities in any significant manner. Additionally, the record reflects that as early as March of 1999, Plaintiff had stopped performing her back stretching exercises, had stopped taking Darvocet most of the time and she had not sought physical therapy or pain clinic evaluation as suggested by her doctors. All of these actions, or lack thereof by Plaintiff, are consistent with the ALJ's determination that Plaintiff's myofacial pain was not severe enough to limit her ability to engage in light work.

Moreover, the ALJ properly noted that  Plaintiff's doctors had continually documented  Plaintiff's improvement when taking Darvocet and Neurontin. According to the medical records, as early as September of 2001, Neurontin helped alleviate Plaintiff's pain even though it made her mentally tired and sluggish. And in May of 2002, the medical records reflect that Plaintiff's chest pain had subsided. In February 2002, Plaintiff reported neck pain, but a year later reported no pain at all, suggesting that Darvocet had significantly helped her symptoms.

Accordingly, the Court concludes that the ALJ did not err at step two and instead properly considered Plaintiff's myofacial pain and fibromyalgia at step four as part of the RFC analysis. And the ALJ did not err at step four because there was substantial evidence in the record to support the ALJ's finding that Plaintiff's myofacial pain and fibromyalgia pain did not impact her ability to perform basic work activities.

**B.    The ALJ Properly Considered The Opinions of  Plaintiff's Treating Physicians**

In his decision, the ALJ concluded that the record failed to show that Plaintiff's myofascial pain/fibromyalgia was a persistent or severe problem. (R. 22-23.) In doing so,

Plaintiff contends that the ALJ improperly rejected the opinions of Plaintiff's treating physicians, Dr. Peterson and Dr. Wiggins because the ALJ failed to state any specific reasons for not agreeing with their opinions. For the reasons discussed below, the Court finds that the ALJ did not improperly ignore the opinions of Plaintiff's treating physicians and that his RFC analysis is not inconsistent with the diagnoses by Drs. Peterson and Wiggins.

It is well established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[33] If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[34]

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[35] Where a treating physician has merely made conclusory statements, the

---

[33] Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). See also Edwards, 937 F.2d at 583-584; Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[34] 20 C.F.R. § 404.1527(d)(2).

[35] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[36]

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[37] However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.[38]

Upon review of the ALJ's decision, as well as an examination of the medical records at issue, the Court determines that the ALJ properly considered the opinions of Dr. Peterson and Dr. Wiggins. As already discussed above, although the treatment notes of Drs. Peterson and Wiggins may have included a diagnosis of myofascial pain and fibromyalgoa, their individual treatment notes do not support a finding of disability. Notably, neither Dr. Peterson nor Dr. Wiggins ever noted any functional limitations caused by Plaintiff's myofascial pain and fibromyalgia.

In his decision, the ALJ properly discussed the reasons supporting his finding that Plaintiff was not disabled. Contrary to Plaintiff's suggestion, the ALJ did not ignore or reject the diagnoses of myofacial pain and/or fibromyalgia by Plaintiff's physicians.

---

[36] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

[37] 20 C.F.R. § 404.1527(d).

[38] Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527(d)(2).

17

Rather, the ALJ concluded that the myofacial pain and/or fibromyalgia was not functionally limiting. For example, the ALJ noted that during Plaintiff's early diagnosis at PulMed H&P, although Plaintiff complained of neck pain a neck sonogram was normal. (R. 21.)  Later in 2001, Plaintiff complained of chest pain but a CT scan of the chest showed no significant cardiovascular abnormalities. (R. 22.) Further, the record discloses that in 2000 and 2001, pulmonary function studies were performed which showed normal respiratory capacities. (R. 21-22.)

Moreover, the treatment notes from Drs. Peterson and Wiggins were considered by the ALJ, which when viewed in their totality support the conclusions of the ALJ because the treatment notes do not contain any mention of or evidence of any functional limitations.  For example, the ALJ specifically noted that the records from Dr. Wiggins reflected that Plaintiff's pain was under control with medication and was dissipating through the years. (R. 22-23). During Plaintiff's follow-up examinations in 2004, Plaintiff stated that she was no longer having pain. Id. Further, Dr. Wiggins noted that although other doctors had suggested that Plaintiff participate in a physical therapy conditioning program and a clinical evaluation for possible pain injections, Plaintiff never followed through.

With regard to Dr. Peterson's treatment notes, Dr. Peterson reported that Plaintiff had no difficulty with range of motion, sensation or circulation. (R. 106, 118.) In August 2002 Dr. Peterson saw Plaintiff for treatment and did not make any mention of myofacial pain or fibromyalgia. Plaintiff treated with Dr. Peterson in May, June, and July 2002 and there is no indication in the treatment notes of complaints of body aches, myofacial pain or fibromyalgia. In December 2002, although Dr. Peterson's notes mention fibromyalgia,

18

Dr. Peterson reported that Plaintiff was doing well on medication and had "no new specific complaints." (R. 108.)

While the Court agrees that the ALJ did not thoroughly discuss every treatment note by Dr. Peterson or Dr.Wiggins the ALJ did properly conclude that these notes do not show a persistent or severe problem "as the record shows that the claimant only occasionally complains of joint pain and when seen most recently in February 2004 stated that she was not having any pain." This conclusion is consistent with the treatment notes of Drs. Wiggins and Peterson and is not, as suggested by Plaintiff, a rejection of the opinions of Plaintiff's treating physicians.

In light of the foregoing, the Court concludes that substantial evidence supports the ALJ's decision and that the ALJ's conclusion -  that Plaintiff's myofacial pain and fibromyalgia were not so severe to cause functional limitations beyond those necessary to perform the basic work activities for light work - was not inconsistent with the medical records of the treating physicians nor inconsistent with the other medical evidence of record.

## VI.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on November 17, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
      Honorable Wm. Terrell Hodges
      Senior United States District Judge

      Counsel of Record